THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JUAN DOMINGUEZ-RUBIO, et al,

    Plaintiffs,

    v.

HEWLETT PACKARD CARIBE BV, LLC,

    Defendant.

Civil No. 13-1139 (ADC)

## OPINION AND ORDER

Plaintiffs, Juan Domínguez-Rubio ("Domínguez") and Urbana Correa-González ("Correa")(collectively, "plaintiffs"), bring suit against defendant, Hewlett Packard Caribe BV, LLC ("HP" or "defendant"), alleging, *inter alia*, that defendant discriminated against Domínguez due to his age.  Plaintiffs also allege that Domínguez was unjustly terminated from his employment on account of the same. Plaintiffs invoke the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and wrongful discharge under Commonwealth of Puerto Rico ("Commonwealth") Act No. 80 of May 30, 1976, as amended, P.R. Laws Ann. tit. 29, § 185a *et seq*. **ECF No. 1**. Further, plaintiffs claim damages, including the payment of wages lost and an additional equal amount as liquidated damages, and front pay. *Id.*

Now before the court is defendant's motion for summary judgment, statement of uncontested facts, reply brief and opposition to additional statement of uncontested material facts as well as plaintiffs' opposing and additional statement of uncontested facts and memorandum in opposition to summary judgment, and sur-reply memorandum. **ECF Nos. 16, 17, 32, 33, 24, 25, 39**.  At issue is whether plaintiffs' allegations and proffered evidence support causes of action for age discrimination and unlawful termination.

I. **Preliminary Matters**

The Court notes that plaintiffs' opposing statement alone is 56 pages long. **ECF No.**

**24**.[1]  This more than doubles the page length of defendant's statement of uncontested facts. **ECF No. 17.**  The reason is quite simple; plaintiffs' opposing statement fails to comply with this Court's Local Rules, specifically its anti-ferret rule.  Local Rule 56(c) states, in pertinent part, "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts."  D.P.R. Civ. R. 56(c).  However, most of plaintiffs' opposing statements are far from concise and nothing close to short.  *See* **ECF No. 33** at ¶¶ 14, 20,27, 29, 30, 31, 33, 39, 54, 77, 79, 86, 88, 89, 90, 96, 97, 98, 99, 106,113, 130, 131.  Some of the opposing statements are over a page long.  *Id.* at ¶¶ 44,48, 92, 93, 94, 95, 101, 108, 111, 112.  Plaintiffs' opposing statements are not only lengthy, they are replete with supplemental information, improper editorialization and attorney argumentation.  *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London,* 637 F.3d 53, 57 (1st Cir. 2011)("Local Rule 56 is in service to Federal Rule of Civil Procedure 56."); *see also CMI Capital Mkt. Inv., LLC v. González–Toro,* 520 F.3d 58, 62 (1st Cir. 2008) ("The purpose of this rule is to relieve the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute.  Like Rule 56 itself, the local rule makes clear that its focus is on *facts,* not speculation or argumentation.  Moreover, these facts must be *material.*").

        The First Circuit Court of Appeals has long held "with a regularity bordering on the monotonous that parties ignore the strictures of an 'anti-ferret' rule at their peril." *Puerto Rico American Ins. Co. v. Rivera-Vázquez,* 603 F.3d 125, 131 (1st Cir. 2010); *see also Ruíz-Rivera v. Riley,* 209 F. 3d 24, 28 (1st Cir. 2000)("absent such rules, summary judgment practice could too easily become a game of cat-and-mouse, giving rise to the 'specter of district court judges being unfairly sandbagged by unadvertised factual issues.'"(quoting *Stephanischen v. Merchants*

---

        [1]The remaining 18 pages of the 74 page document are plaintiffs' additional statements of uncontested facts.  *Id.*

*Despatch Transp. Corp.*, 722 F.2d 922, 931 (1st Cir. 1983)).  Consequently, the Court will disregard plaintiffs' statements that do not comply with the Local Rules or attempt to create a controversy of fact with blatant editorials and attorney argument, masked as opposing or additional statements of uncontested facts.

In addition, defendant vehemently objects to the Court's consideration of Domínguez's post-deposition affidavit, stating that the same is self-serving, contradicts Domínguez's deposition testimony, and contains legal argument and conclusions to attempt to create a triable issue of fact to resist summary judgment.  **ECF Nos. 24-1, 32.**  This affidavit serves to support most of plaintiffs' opposing and additional statement of uncontested facts.  *See generally* **ECF No. 24.**  Defendant calls the Court's attention to the fact that the affidavit is dated May 27, 2014, the date plaintiffs' opposition was due and submitted before the Court, suggesting its motive: a purposeful ploy to defeat the inevitable axe of summary judgment. **ECF No. 30** at 3-4.  Furthermore, defendant posits that plaintiffs have not even attempted to explain why an affidavit was necessary or the reasons for these apparent discrepancies.  *Id.* at 4.

The Court has reviewed Domínguez's affidavit carefully and the same raises matters that were not proffered in his deposition testimony and contradicts his own admissions and deposition testimony.  The affidavit primarily assembles his assertions, arguments, and justifications regarding his claims against the defendant.  The same contains speculation and hearsay and are improper to oppose summary judgment.  As the First Circuit has made abundantly clear, the Court need not "take at face value [plaintiff's] subjective beliefs when they are not factually based and merely constitute conclusory, self-serving statements." *Torrech-Hernández v. General Elec. Co.*, 519 F.3d 41, 48 (1st Cir. 2008); *see also Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) (material creating a factual dispute "must herald the existence of 'definite, competent evidence' fortifying the plaintiff's version of the truth")(citing *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991)).

Therefore, "[w]hile it is true that in the summary judgment context all *reasonable* inferences must be drawn in favor of the non-moving party, the District Court is not obliged to accept as true or to deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the Court by a party." *Torrech-Hernández v. General Elec. Co.*, 519 F.3d at 47, n.1.  By like token, the Court need not entertain the plaintiff's seemingly discrepant narrative of the events. *See Meuser v. Federal Express Corp.* 564 F.3d 507, 515 (1st Cir. 2009)(internal citation and quotations omitted)("the non-moving party's burden cannot be satisfied with a declaration that without proper explanation contradicts his/her prior deposition testimony.").  Thus, the Court will disregard the affidavit inasmuch as it contradicts or embellishes what Domínguez was already questioned on and provided testimony for during his deposition. *Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc.*, 447 F.3d 105, 110 (1st Cir. 2006)(affirming court's decision to disregard affidavit because it found the same to be an attempt to manufacture issues of fact in order to survive summary judgment); *see also Colantuoni v. Alfred Calcagni & Sons,* 44 F.3d 1, 4–5 (1st Cir.1994) ("When an interested witness has given clear answers to unambiguous questions, he cannot create a conflict and resist summary judgment with an affidavit that is clearly contradictory, but does not give a satisfactory explanation of why the testimony is changed.").

## II.    Factual Background

Unless otherwise noted, the following relevant facts are derived from defendant's statement of facts, plaintiffs' responses and additional statements of fact and defendant's responses. **ECF Nos. 17, 24, 33**.  Consistent with the summary judgment standard, the court states the facts in the light most favorable to plaintiff, the nonmoving party. *See Iverson v. City of Boston*, 452 F.3d 94, 98 (1st Cir. 2006).

### A.    Dominguez's Work History

The Hewlett Packard Company is organized into seven business segments: Personal

Systems; Printing; Services: Enterprise Servers; Storage and Networking ("ESSN"); Software HP Financial Services; and, Corporate Investments. **ECF No. 17** at ¶ 2. ESSN provides server, storage and networking products that fulfill a wide range of customer needs and market requirements. **ECF No. 17** at ¶ 3; **ECF No. 24** at ¶ 3.

Domínguez is a licensed electrical engineer with over 38 years of experience in the electronic manufacturing industry. **ECF No. 24**, Plaintiffs' Additional Statements of Uncontested Facts ("PASOUF") at ¶ 1. He graduated with a Bachelor's degree in Electrical Engineering at the University of Puerto Rico ("UPR") Mayagüez Campus in 1974 at the age of 23. **ECF No. 24** PASOUF at ¶ 2; **ECF No. 33** at ¶ 2. In 1973, Domínguez began to work with Digital Equipment Corporation in San Germán while he was completing his engineering degree. **ECF No. 24** PASOUF at ¶ 3; **ECF No. 33** at ¶ 3. He worked at Digital Equipment Corporation in San Germán and Aguadilla from 1973 to 1992. He started as a Manufacturing Technician until the completion of his engineering degree at UPR Mayagüez Campus. He then worked as Manufacturing Engineer, Senior Manufacturing Engineer, and Manufacturing Product Engineering Manager. **ECF No. 24** PASOUF at ¶ 4; **ECF No. 33** at ¶ 4. In 1992, Digital Equipment closed its operations in Puerto Rico and Domínguez was unemployed for two years, until 1995. At that time, he began working for Sensormatic Electronics Corporation as a Test Development Engineer. **ECF No. 24** PASOUF at ¶ 5; **ECF No. 33** at ¶ 5. Five months later, he worked with Telecom Solutions Puerto Rico, Inc. as Manufacturing Engineer, from 1995 until 1997. **ECF No. 24** PASOUF at ¶ 6; **ECF No. 33** at ¶ 6.

In 1997, HP offered Domínguez a position as Product Engineer. **ECF No. 24** PASOUF at ¶ 7; **ECF No. 33** at ¶ 7. He began working as a Product Engineer for HP on June 16, 1997. **ECF No. 17** at ¶ 4; **ECF No. 24** at ¶ 4. On May 28, 2012, Domínguez received notice that he had been placed on a Workforce Reduction Program ("WRP"); he worked at HP until August 3, 2012. **ECF No. 17** at ¶ 5; **ECF No. 24** at ¶ 5. Throughout his employment with HP, Domínguez always occupied the Product Engineer position. **ECF No. 17** at ¶ 6; **ECF No. 24**

at ¶ 6.  Domínguez's duties as Product Engineer included having some products assigned to him, overseeing quality at the customer level, internal quality, and documentation of certain processes, managing new product introduction, and reporting to management concerning problems involving his products, among others, such as program engineering, prototype building, technical knowledge transfer, production preparation, and mature product phase. **ECF No. 17** at ¶ 8; **ECF No. 24** at ¶ 8.  In 2010, HP stopped giving Domínguez new products. Instead, he worked on BCS[2] and NED products because both products were mature and he was familiar with the products.  It did not make business sense to remove him from the mature products that he had been working with since it would entail those products being assigned to a different Product Engineer.  **ECF No. 24** PASOUF at ¶ 11; **ECF No. 33** at ¶ 11. By 2012, Domínguez had worked half of the time on BCS products and the other half on the NonStop NED-Sequoia computers.  **ECF No. 17** at ¶ 9; **ECF No. 24** at ¶ 9.[3]

Leonardo Cuello ("Cuello") was a Product Engineer who worked with the NonStop NED computers and BCS products.  **ECF No. 17** at ¶ 11; **ECF No. 24** at ¶ 11.[4]  The NED computers had more boards, were more reliable than BCS, and are a system of computers that are never shut down. **ECF No. 17** at ¶ 12; **ECF No. 24**, at ¶ 12.  Domínguez spent most of his time working with the BCS products, where problems surfaced that were his responsibility. **ECF No. 17** at ¶ 13; **ECF No. 24** at ¶ 13.[5]  He did not have to spend much time working with

---

[2]BCS stands for " Business Critical Systems" products that delivers HP's mission critical Converged Infrastructure.  **ECF No. 17** at ¶ 10; **ECF No. 24**, at ¶ 10.

[3]Although plaintiff denied this statement, the explanation given is more of a qualification of the referenced deposition testimony than a denial.

[4]Plaintiffs' partial admission of this statement is noted.  Yet, the paragraph submitted in support of the denial simply adds proposed additional facts to the statement that should be filed through a separate opposing statement.  It does not, however, counter the defendant's statement.

[5] The paragraph plaintiffs submit in support of the partial denial/qualification simply adds facts to the statement that should be filed through a separate opposing statement.  It does not, however,

the NED-Sequoia since it was sporadically produced and did not require an engineer to work full time on it. **ECF No. 17** at ¶ 14.

By 2010, the BCS products were no longer being developed in Puerto Rico, but the responsibility for the manufacture of the products that were being shipped at that time fell upon PRMO.[6] **ECF No. 17** at ¶ 15; **ECF No.** 24, at ¶ 15. Regarding BCS products, Domínguez worked on the manufacturing side; oversaw its quality; and, had the responsibility to deal with any problems to solve them. **ECF No. 17** at ¶ 16; **ECF No.** 24 at ¶ 16. Domínguez received a client complaint regarding his performance on the NED computers because he did not complete the Root Cause Analysis in a timely manner. **ECF No. 17** at ¶¶ 17-18; **ECF No.** 24 at ¶¶ 17-18. The client that complained about Domínguez sent a copy of the complaint to his manager to inform him of the situation. **ECF No. 17** at ¶ 19; **ECF No.** 24 at ¶ 19.

Around 2011-2012, the BCS products that Domínguez was working on were being transferred to Asia, particularly to Singapore. **ECF No. 17** at ¶ 24; **ECF No.** 24 at ¶ 24. Domínguez participated in the meetings and discussions regarding the transfer of the BCS products to Asia. **ECF No. 17** at ¶ 25; **ECF No.** 24 at ¶ 25. He was the engineer in charge of coordinating the transfer of the BCS boards and equipment sent from Puerto Rico to Asia. **ECF No. 17** at ¶ 26; **ECF No.** 24 at ¶ 26. By Fiscal Year 2012, Domínguez was the only Product Engineer at PRMO working with the BCS products. **ECF No. 27 at ¶ 27.** At the time Domínguez was laid off from his employment, though the planning was complete, the transfer of the BCS products had not been completed. **ECF No. 17** at ¶ 28; **ECF No.** 24 at ¶ 28.

On January 31, 2012, Sarah Aikenhead sent an e-mail with the subject: "EMAP meeting 31 Jan 2012.pptx" to various HP employees, including Domínguez, where the strategy for the BCS product exit was discussed; the e-mail indicated that the NonStop product was going to

_____

counter the statement.

[6] "PRMO" is not defined in the statements of fact.

remain in PRMO.  **ECF No. 17** at ¶ 29; **ECF No.** 24 at ¶ 29.  The BCS transfer to Singapore impacted only the products that Domínguez was working on, which was why he was the only Product Engineer in the e-mail. **ECF No. 17** at ¶ 30; **ECF No.** 24 at ¶ 30.  On February 1, 2012, Jesús Ramos sent an e-mail to various HP employees, including Domínguez, where it indicated that BCS had decided to exit its manufacturing presence at PRMO for their hardware products and that the goal was to exit PRMO by the end of the second quarter of Fiscal Year 2012. **ECF No. 17** at ¶ 31; **ECF No.** 24 at ¶ 31. Domínguez admitted that he was aware that the BCS products were no longer going to be manufactured at PRMO. **ECF No. 17** at ¶ 32; **ECF No. 24** at ¶ 32.  Domínguez admitted that he only worked with the hardware of the BCS product.  **ECF No. 17** at ¶ 33.

By 2012, the number of BCS modules being manufactured, which Domínguez had been working on, had decreased.  **ECF No. 17** at ¶ 35; **ECF No. 24** at ¶ 35. After Domínguez was laid off, HP did not recruit another Product Engineer. **ECF No. 17** at ¶ 37; **ECF No. 24** at ¶ 37.[7] Domínguez does not have any evidence of any product engineer being hired after he was laid-off.  **ECF No. 17** at ¶ 38; **ECF No. 24** at ¶ 38.  The duties Domínguez performed with BCS were reassigned to Cuello until October 2012, when the transfer of the BCS products concluded. **ECF No. 17** at ¶ 39.[8]  Cuello had more seniority at HP than Domínguez.  **ECF No. 17** at ¶ 40; **ECF No. 24** at ¶ 40.

B.     **Domínguez's Performance History**

Domínguez admitted that he was subjected to disciplinary actions and performance admonishments during his employment at HP.  **ECF No. 17** at ¶ 44; **ECF No. 24** at ¶ 44.  On

---

[7]Here, plaintiffs admit "Statement No. 35" in their paragraph 37 (**ECF No. 24** at ¶ 37); however, the Court understand this to be a typographical error since plaintiffs qualified statement 35 in the preceding page, at the corresponding paragraph.

[8]Here, plaintiffs deny "Statement No. 38" in their paragraph 39, which had already been admitted in the preceding paragraph.

February 8, 2007, Domínguez was issued an admonishment by his Manager José Bachier due to communication and compliance issues. **ECF No. 17** at ¶ 45; **ECF No. 24** at ¶ 45. Domínguez admitted that, at that time, he would not answer his e-mails or voicemails and that he had problems with compliance. **ECF No. 17** at ¶ 46; **ECF No. 24** at ¶ 46. On May 30, 2008, Domínguez was issued a disciplinary warning by Bachier because he showed up at a temporary employee's house, which made her feel uncomfortable since she had never given him her residential address. **ECF No. 17** at ¶ 48. Domínguez made a handwritten note to the disciplinary warning. **ECF No. 17** at ¶ 49. Domínguez admitted that he delivered "acerolas" (West Indian cherries) to the temporary employee at her home. **ECF No. 17** at ¶ 50. On April 20, 2012, Domínguez was issued a performance warning because he had allowed mandatory/required certifications to become expired and overdue. **ECF No. 17** at ¶ 51. More than twice Domínguez failed to take the re-certifications in a timely manner. **ECF No. 17** at ¶ 52. Domínguez admitted that he was wrong by failing to take the re-certifications. **ECF No. 17** at ¶ 53; **ECF No. 24** at ¶ 53. He told his manager Manuel Martínez that he kept forgetting things. **ECF No. 17** at ¶ 54; **ECF No. 24** at ¶ 54.

Nothing in Domínguez's 2008 performance evaluation showed that he did not meet his performance goals. **ECF No. 24** PASOUF at ¶ 78; **ECF No. 33** at ¶ 78. Employee objective roles are measured quantitatively. **ECF No. 24** PASOUF at ¶ 79; **ECF No. 33** at ¶ 79.[9] Domínguez does not know the performance ratings of the Product Engineers in his group (**ECF No. 17** at ¶ 56; **ECF No. 24** at ¶ 56), nor is he aware of whether any other Product Engineer received a performance warning (**ECF No. 17** at ¶ 55; **ECF No. 24** at ¶ 55). For the Fiscal Year 2009 performance evaluation that his manager José Bachier prepared, Domínguez received a "P+" rating, which exceeds expectations. **ECF No. 17** at ¶ 57; **ECF No. 24** at ¶ 57. Domínguez did not write any comments to that evaluation. **ECF No. 17** at ¶ 58; **ECF No. 24** at ¶ 58. Bachier observed that Domínguez could improve in the speed in which he achieved

---

[9] Although defendant denies this statement, the explanation serves to qualify the same. *See* **ECF No. 33** at 18.

results because sometimes a quicker resolution could be needed.  Bachier further noted: "Some people may mistakenly interpret his analysis as a lack of urgency."  **ECF No. 17** at ¶ 59; **ECF No. 24** at ¶ 59.  Domínguez admitted that he takes longer to analyze a problem because he tends to analyze problems in greater depth.  **ECF No. 17** at ¶ 60; **ECF No. 24** at ¶ 60.

During 2010, Domínguez felt he had no support from management when they would move personnel on more than 4 occasions and forced him to train new personnel.  The operators and technicians came from a pool and were not assigned to a particular Product Engineer or production line.  However, no other Product Engineer had difficulty working with the technician pool.  **ECF No. 24** PASOUF at ¶ 50; **ECF No. 33** at ¶ 50.  In 2010, Domínguez brought to his supervisor Gloria Figueroa's ("Figueroa") attention that he had a heavy workload.  At PRMO, all Product Engineers manage a heavy workload and it is their responsibility to manage it efficiently.  **ECF No. 24** PASOUF at ¶ 51; **ECF No. 33** at ¶ 51.

Domínguez discussed the 2010 Fiscal Year performance evaluation with Figueroa, and agreed with the same.  **ECF No. 17** at ¶ 61; **ECF No. 24** at ¶ 61.  Domínguez received a "P-" rating, which means Development Needed to Achieve Expectations and agreed with the same.  **ECF No. 17** at ¶ 62; **ECF No. 24** at ¶ 62.  Domínguez agreed with the assessment Figueroa made that, "compared to his peers, this year Juan seemed to have some degree of difficulty in managing multiple priorities concurrently."  **ECF No. 17** at ¶ 64; **ECF No. 24** at ¶ 64.  As an area in which to improve, Figueroa observed in the 2010 performance evaluation that Domínguez needed to be sensitive in communicating properly with production personnel by escalating process performance issues that required attention through the production management structure.  **ECF No. 17** at ¶ 65; **ECF No. 24** at ¶ 65.  Domínguez admitted that his problems in dealing with the prototypes  led to the "P-" rating.  **ECF No. 17** at ¶ 66.[10]

---

[10] Although plaintiffs deny this statement, their response only qualifies and clarifies the statement and Domínguez' admission.  **ECF No. 24** at ¶ 67.

Domínguez discussed his 2011 Fiscal Year performance evaluation with his Manager Manuel Martínez ("Martínez"), and agreed with the same.  **ECF No. 17** at ¶ 67; **ECF No. 24** at ¶ 67.   Domínguez agreed with the "PA" rating, which means Partially Achieves Expectations.  **ECF No. 17** at ¶ 68; **ECF No. 24** at ¶ 68.   No salary raises or promotions are available to those employees who obtain a "PA" or a "P-" rating.  **ECF No. 17** at ¶ 69; **ECF No. 24** at ¶ 69.  Domínguez agreed with Martínez's assessment that "results have been good, these have been with some level of delay, some with small delays, some with big delays, some even escalated to his manager for action."  **ECF No. 17** at ¶ 70; **ECF No. 24** at ¶ 70.  He admitted that the assessment Martínez made regarding the delays in the results is consistent with the assessments his previous managers, Bachier and Figueroa, had made.  **ECF No. 17** at ¶ 71; **ECF No. 24** at ¶ 71.  He also admitted to Martínez that his problem in keeping up with requests was mainly because he could not remember some of them.  **ECF No. 17** at ¶ 72; **ECF No. 24** at ¶ 72.

Domínguez admitted that his manager had to follow up with him personally regarding many requests showing the need for completion.  **ECF No. 17** at ¶ 73.[11]  Domínguez admitted that, even though he demonstrated the ability to deal with technical challenges, he seemed not able to maintain control on due dates.  **ECF No. 17** at ¶ 74.[12]  Domínguez admitted to the rest of the performance evaluation, including that his work met quality standards, but consistently did not follow through on actions and mostly required multiple follow-ups to complete the work; and that it was difficult to work with and rely on him to take on or complete tasks, mostly the reasons for which his customers would follow up with him repeatedly.  **ECF No. 17** at ¶ 75.[13]

Domínguez admitted that he did not attend certain quality meetings, and that Martínez

[11]Plaintiffs' opposing statement refers to statement 71.  *See* **ECF No. 24** at ¶ 73.

[12]Plaintiffs' opposing statement refers to statement 64.  *See* **ECF No. 24** at ¶ 74.

[13]Plaintiffs' opposing statement refers to statement 65.  *See* **ECF No. 24** at ¶ 75.

had to get him to attend the meetings.  **ECF No. 17** at ¶ 76.  Domínguez also admitted that the other Product Engineers did not have the same amount of problems in the production line as he.  **ECF No. 17** at ¶ 77.  Due to the problems that Domínguez was encountering in the production line, he would fail to attend the compulsory quality meetings and would not submit the certifications on time.  **ECF No. 17** at ¶ 78.  Domínguez had some of the yearly certifications past due without completion and management intervened for him to complete them.  **ECF No. 17** at ¶ 79.  Domínguez stated that he felt he had millions of things to do; therefore, he would forget things sometimes.  Martínez responded by telling him to get a notebook and write down his tasks in order not to forget them.  **ECF No. 24** PASOUF at ¶ 54; **ECF No. 33** at ¶ 54.  On April 19, 2012, Martínez sent an e-mail to Domínguez requesting he provide the certifications of the trainings that he told him to take 3-4 weeks prior.  **ECF No. 17** at ¶ 80; **ECF No. 24** at ¶ 80.

### C.     HP's Business

On May 23, 2012, the Hewlett Packard Company adopted a multi-year restructuring plan designed to simplify business processes, accelerate innovation and deliver better results for customers, employees, and stockholders by eliminating 29,000 positions through fiscal year 2014.  **ECF No. 17** at ¶ 114; **ECF No. 24** at ¶ 114.[14]  As part of the restructuring, the Hewlett Packard Company expected to save approximately $3.3 billion from workforce reductions and early retirement programs.  **ECF No. 17** at ¶ 115; **ECF No. 24** at ¶ 115.[15]

For the three and nine months ending on July 31, 2012, the total net revenue for the Hewlett Packard Company decreased 4.9% and 5.0%, respectively, with the main reason being a soft demand environment resulting in volume declines in hardware business.  **ECF No. 17**

---

[14] Although plaintiffs deny this statement, their explanation only qualifies the referenced corporate entity.  *See* **ECF No. 24** at 50.

[15] Although plaintiffs deny this statement, their explanation only qualifies the referenced corporate entity.  *See* **ECF No. 24** at 50.

at ¶ 116; **ECF No. 24** at ¶ 116.[16]   The Hewlett Packard Company's ESSN's net revenue decreased by 3.8% and 6.6% for the three and nine months ending on July 31, 2012, respectively, due to revenue decreases in ISS, BCS and Storage.   HP's net revenue decreased 7.1% in Fiscal Year 2012 due to revenue decreases in ISS, BCS and Storage, with a 25% decrease in BCS as a result of lower demand for Itanium-based servers. **ECF No. 17** at ¶¶ 117-18; **ECF No. 24** at ¶¶ 117-18.[17]   BCS net revenue decreased by 16% and 22% in the three and nine month periods ending on July 31, 2012, respectively, mainly due to a lower demand following a March 2011 announcement by an alliance partner, stating that it would cease software support for Hewlett Packard's Itanium-based servers. **ECF No. 17** at ¶ 119; **ECF No. 24** at ¶ 119.[18]

For Fiscal Year 2012, Hewlett Packard Company's revenue had decreased 5.4% due to weak customer demand resulting in volume declines in the hardware businesses and printing supplies. **ECF No. 17** at ¶ 120; **ECF No. 24** at ¶ 120.[19]   The company had been experiencing a multi-quarter decline in revenue and operating margins due to many factors, including weakness in consumer spending, weak demand in the enterprise sectors in Europe, and

---

[16]Although plaintiffs deny this statement, their explanation only qualifies that the referenced corporate entity is the Hewlett Packard Company, and not its subsidiary HP.  *See* **ECF No. 24** at 50.

[17]Although plaintiffs deny these statements, their explanation only qualifies that the referenced corporate entity is the Hewlett Packard Company.  *See* **ECF No. 24** at 50-51.  Plaintiffs' further references are attorney argument that do not make for a proper denial.

[18]Although plaintiffs deny this statement, their explanation only qualifies that the referenced corporate entity is the Hewlett Packard Company.  *See* **ECF No. 24** at 51. Plaintiffs' argument as to the reason for dismissal does not serve to contest the proposed statement.

[19]Although plaintiffs deny this statement, their explanation only qualifies that the referenced corporate entity is the Hewlett Packard Company.  *See* **ECF No. 24** at 51-52. Plaintiffs' argument as to the reason for dismissal does not serve to contest the proposed statement.

declining growth in some emerging markets.  **ECF No. 17** at ¶ 121; **ECF No. 24** at ¶ 121.[20]  The decline in financial performance reflected various challenges such as: the need to align costs with revenue; under investment in research and development and internal IT systems; and trends such as growth of mobility and increasing demand for hyperscale computing infrastructure.  **ECF No. 17** at ¶ 122.[21]

As a result of these challenges, the company began implementing cost-reduction initiatives, including a company-wide restructuring plan.  **ECF No. 17** at ¶ 123.[22]  The purpose of the reduction in force was to eliminate "head count costs."  Regardless of the position and the cost of laying-off an employee, HP applies the same sub-event code.  **ECF No. 24** PASOUF at ¶ 63; **ECF No. 33** at ¶ 63.[23]  Its purpose was to generate savings.  According to management, HP's global workforce reduction program expected to generate run-rate cost savings of approximately three to five billion dollars.  The workforce reduction was also a part of a restructuring plan designed to simplify business processes, accelerate innovation and deliver better results for customers, employees, and stockholders.  **ECF No. 24** PASOUF at ¶ 104; **ECF No. 33** at ¶ 104.

### D.       Domínguez's Termination

During Domínguez's tenure at HP, he never complained in writing about being discriminated due to age.  **ECF No. 17** at ¶ 81; **ECF No. 24** at ¶ 81.  In an e-mail Domínguez sent to Corporate Compliance, Domínguez never indicated that he was terminated from employment because of his age.  **ECF No. 17** at ¶ 82; **ECF No. 24** at ¶ 82.  PRMO complies with

---

[20]Although plaintiffs deny this statement, their explanation only qualifies that the referenced corporate entity is the Hewlett Packard Company, not the defendant subsidiary.  *See* **ECF No. 24** at 52.  Plaintiffs' argument as to the reason for dismissal does not serve to contest the proposed statement.

[21]Plaintiffs make reference to Statement 121.  **ECF No. 122** at  ¶ 122.

[22]Plaintiffs make reference to Statement 121.  **ECF No. 122** at ¶ 123.

[23]Although defendant denies this statement, the explanation serves to qualify the same.

Human Resources decisions ordered by the parent company.  **ECF No. 24** PASOUF at ¶ 59; **ECF No. 33** at ¶ 59.  Kris Hamner ("Hamner") is the ESSN Human Resources Business Partner for Hewlett-Packard's Enterprise Group.  He operates from Palo Alto, California and supports the manager of HP's Puerto Rico office.  He prepared the slate of persons that were going to be terminated.  **ECF No. 24** PASOUF at ¶ 64; **ECF No. 33** at ¶ 64.  The decision at the local level was made in May.  **ECF No. 24** PASOUF at ¶ 66; **ECF No. 33** at ¶ 66.

David Trabal ("Trabal") is HP's Human Resources Manager for Puerto Rico and the Caribbean.  **ECF No. 17** at ¶ 83; **ECF No. 24** at ¶ 83.  Trabal testified as party representative for the defendant.  **ECF No. 24** PASOUF at ¶ 58; **ECF No. 33** at ¶ 58.  Among his duties, Trabal supports the business needs of any WRP program implemented in Puerto Rico and at PRMO.  **ECF No. 17** at ¶ 84; **ECF No. 24** at ¶ 84.  Around April of 2012, Hamner contacted Lucy Crespo ("Crespo"), PRMO General Manager, to notify her of the WFR and advise her that she needed to identify lower performers within PRMO to be included in the WFR.  **ECF No. 17** at ¶ 86.  Each local unit, in this case, PRMO, is responsible in deciding how it will comply with its share of the reduction.  **ECF No. 17** at ¶ 88. The local management team decides on the reduction in force while keeping the business healthy.  **ECF No. 17** at ¶ 89.  The decision to implement a WFR in 2012 was due to financial reasons.  **ECF No. 17** at ¶ 91.

On April 19, 2012, Hamner sent an e-mail to Crespo with the subject: "PR Lower Performers," which included the names and employment data of lower performers that Crespo had identified, including Domínguez.  **ECF No. 17** at ¶ 92.  The lower performers identified in the e-mail had a performance rating of PA (Partially Achieves Expectations), which prior to Fiscal Year 2011 was identified as P-, and DN (Does Not Achieve Expectations).  **ECF No. 17** at ¶ 93.  Crespo responded to Hamner's e-mail, indicating that she felt comfortable committing to 8 people for the WRP, as 12 could have a negative impact on the operations.  **ECF No. 17** at ¶ 95.  The notification to the employees affected by the WRP was set for May 28, 2012.  **ECF No. 17** at ¶ 96.  On May 8, 2012, Trabal sent an e-mail to Julie Weiler and Hamner, identifying the employees to be included in the WRP slate.  **ECF No. 17** at ¶ 97.

The following employees were included in the May 2012 WRP:

| Employee | Job Title | Performance Rating | Seniority |
|---|---|---|---|
| Salvador Vega | Manufacturing Ops Assoc. III | PA | 31 |
| Yolanda Fernandez | R&M Technician IV | PA | 1 |
| Sixto Escudero | Manufacturing Ops Assoc. III | PA | 15 |
| Hector Freyre | R&M Technician IV | PA | 1 |
| Juan A. Domínguez | Product Engineer IV | PA | 14 |
| Elizabeth Ortega | Supv. Manufacturing Ops. I | PA | 30 |
| Cesar Guillet | Supv. Manufacturing Ops. I | PA | 15 |
| Roger Saltares | Procurement Engineer II | PA | 1 |

**ECF No. 17** at ¶ 98.  Domínguez was laid-off due to HP's WRP, which was implemented as part of an ongoing process to restructure the company in order to align the business and improve its competitiveness.  **ECF No. 17** at ¶ 99.

At the time the WRP slate was prepared, 2011 Fiscal Year performance ratings were considered.  **ECF No. 17** at ¶ 101.  If an employee consistently had lower ratings, that would be considered for the WRP.  **ECF No. 17** at ¶ 102.  The employees impacted by the WRP belonged to different occupational positions.  **ECF No. 17** at ¶ 103; **ECF No. 24** at ¶ 103. Domínguez was the only Product Engineer in the eight-employee slate impacted by the WRP. **ECF No. 17** at ¶ 104; **ECF No. 24** at ¶ 104.  The eight PRMO employees impacted by the WRP had a PA performance rating.  **ECF No. 17** at ¶ 107. The reasons Domínguez was selected for the WRP were that the BCS product that Domínguez had been working on was being transferred and that there was a clear difference with his performance in comparison to the rest of the product engineers.  **ECF No. 17** at ¶ 106.

In 2012, Luis López ("López") was the Engineering Manager at PRMO. **ECF No. 17** at ¶ 109; **ECF No. 24** at ¶ 109.  As Engineering Manager, López was in charge of three engineering groups, including the Product Engineering Group, which worked with NED, Tipping Point, Industry Standard Servers, Storage and BCS. **ECF No. 17** at ¶ 110; **ECF No. 24** at ¶ 110. According to López and Martínez, one of Domínguez's issues was that his supervisors constantly had to follow up on projects assigned to him and he required active supervision. **ECF No. 17** at ¶ 111.  The direct consequence of Domínguez's failure to meet deadlines was the delays in the projects and that he could not be assigned to work on other projects simultaneously since he was unable to perform multiple tasks. **ECF No. 17** at ¶ 112. An engineer with Domínguez's experience at HP is expected to perform simultaneous tasks and be aware of project deadlines. **ECF No. 17** at ¶ 113; **ECF No. 24** at ¶ 113.

Domínguez was aware that the Hewlett-Packard Company was going to implement a WRP that would impact around 25,000 employees. **ECF No. 17** at ¶ 41; **ECF No. 24** at ¶ 41. Domínguez was not the only HP employee impacted by the WRP at PRMO. **ECF No. 17** at ¶ 43; **ECF No. 24** at ¶ 43.

For Fiscal Year 2011-2012, Manuel Martínez supervised seven Product Engineers. These Product Engineers were Domínguez, Leonardo Cuello, Ángel Cortés, José Cordero, Pedro Lasalde, Emily Angarita, and Miguel Acevedo. **ECF No. 17** at ¶ 124.  The engineers in the Product Engineering Group were :

|                  | Seniority | Age | Rating  |
|------------------|-----------|-----|---------|
| Leo Cuello       | 26        | 52  | SE      |
| Angel Cortes     | 19        | 47  | AE      |
| Juan Domínguez   | 15        | 61  | PA      |
| José Cordero     | 14        | 40  | SE      |
| Pedro Lasalde    | 13        | 53  | SE      |
| Emily Angarita   | 11        | 41  | EE      |
| Miguel Acevedo   | 0         | 41  | No Eval |

**ECF No. 17** at ¶ 125.

Martínez prepared the performance evaluation for Cuello for Fiscal Year 2011 and gave him an "SE" rating, which means Significantly Exceeds Expectations. **ECF No. 17** at ¶ 126; **ECF No. 24** at ¶ 126. Martínez prepared the performance evaluation of Cortés for Fiscal Year 2011 and gave him an "AE" rating, which means Achieves Expectations. **ECF No. 17** at ¶ 127; **ECF No. 24** at ¶ 127. Martínez prepared the performance evaluation for Cordero for Fiscal Year 2011 and gave him an "SE" rating. **ECF No. 17** at ¶ 128; **ECF No. 24** at ¶ 128. Martínez prepared the performance evaluation for Lasalde for Fiscal Year 2011 and gave him an "SE" rating. **ECF No. 17** at ¶ 129; **ECF No. 24** at ¶ 129. Martínez prepared Angarita's performance evaluation for Fiscal Year 2011 and gave her an "EE" rating, which means Exceeds Expectations. **ECF No. 17** at ¶ 133; **ECF No. 24** at ¶ 133. Acevedo was a new hire by the time that the Fiscal Year 2011 performance evaluations were made, thus, he does not have a performance evaluation for that year. **ECF No. 17** at ¶ 130. Acevedo was assigned to the NexCom Product Family because, at the time, he had the ability to manage this product while managing his other responsibilities. **ECF No. 17** at ¶ 131. At the time of the workforce reduction, Acevedo had not been given any performance or disciplinary warnings. **ECF No. 17** at ¶ 132; **ECF No. 24** at ¶ 132. Although Trabal's no disciplinary action certification does not include any of the product engineers in Domínguez's group, Cuello Lasalde, Cortés, Angarita and Cordero were not subject to any disciplinary actions and/or performance warnings between 2011-2012. **ECF No. 24** PASOUF at ¶ 47; **ECF No. 33** at ¶ 47.

Martínez was Domínguez's supervisor at the time of termination and he gave Domínguez the termination letter. He was not part of the committee that considered the slate, although Martínez's supervisor, Luis López, the Engineering Manager, was. **ECF No. 24** PASOUF at ¶ 101; **ECF No. 33** at ¶ 101. Domínguez was placed on a Redeployment program, which gave him the opportunity to search for other jobs at HP for which he may be qualified for. This opportunity lasted 5 weeks. If he could not find any employment during those 5 weeks, he automatically would be terminated on August 3, 2012. **ECF No. 17** at ¶ 134 and

PSOUF at ¶ 93; **ECF No. 24** at ¶ 134; **ECF No. 33** at ¶ 93.  Following the announcement of his termination in May 2012, Domínguez gave his résumé to Manager Jesús Ramos, who requested it from him and told him there would be openings available.  **ECF No. 24** PASOUF at ¶¶ 55-56.  At the time of Domínguez's termination, other groups in PRMO were working with other business segments besides ESSN, including Personal Systems and HP Financial Services.  However, none of the Product Engineers worked for HP Financial Services.  The Product Engineers that worked for Personal Systems worked with Personal Computer (PC) memories, which are different and unrelated duties to those performed in the Product Engineering Group.  **ECF No. 24** PASOUF at ¶ 16; **ECF No. 33** at ¶ 16.

At the time of termination, Domínguez was working on NED products, including Sequioa, P-switch, SWAN1, SWAN2, and Diaton products.  P-switch, SWAN1, SWAN2, and Diaton products were all low volume products.  **ECF No. 24** PASOUF at ¶ 19; **ECF No. 33** at ¶ 19.  Domínguez  spent most of his time working on some BCS products because problems arose with the BCS product in the Sandune Printed Circuit Board, which was channeled as a material quality problem through the Materials Engineering Group and later sent to the supplier for material reconditioning.  **ECF No. 24** PASOUF at ¶ 22; **ECF No. 33** at ¶ 22. Domínguez worked with the manufacture of components of the BCS products and with specific components of parts of non-BCS family products, whose manufacturing remained in Puerto Rico after his termination.  The non-BCS products that Domínguez was working at the time of his termination, that were not transferred to Singapore, were all related to NED and were of low volume.  After Domínguez's termination, these NED products were reassigned to Cuello.  Cuello was the engineer in charge of the bulk of NED products at that time.  Cuello had 26 years of seniority with HP and was 52 years old.  His 2011 Fiscal Year performance rating was a "Significantly Exceeds Expectations," the highest performance rating at HP.  **ECF No. 24** PASOUF at ¶¶ 20, 31, 34, 45; **ECF No. 33** at ¶¶ 20, 31, 34, 35.

José Cordero, Pedro Lasalle, Emily Angarita and Miguel Acevedo had less seniority and were younger than Domínguez and remained working with the defendants.  **ECF No. 24**

PASOUF at ¶ 45; **ECF No. 33** at ¶ 45.  For completion of the slate for the reduction in force, Trabal did not remember receiving any e-mail regarding the employees' performance for Fiscal Year 2011.  **ECF No. 24** PASOUF at ¶ 68; **ECF No. 33** at ¶ 68.  Trabal saw the slate in a final meeting, where it was decided to submit the same as the final version.  **ECF No. 24** PASOUF at ¶ 71; **ECF No. 33** at ¶ 71.[24]  Trabal stated that the 2011 Mid-Year Performance and Career Conversation Policy was not discussed in the meetings where the workforce reduction was discussed because this policy is part of the manager's preparation regarding employees' performance.  **ECF No. 24** PASOUF at ¶ 76; **ECF No. 33** at ¶ 76.  The only performance evaluation numbers that appear in the slate are those for Fiscal Year 2011.  **ECF No. 24** PASOUF at ¶ 77; **ECF No. 33** at ¶ 77.[25]  The persons in the slate selected for the workforce reduction program were chosen mainly for performance, not the elimination of the BCS production line.  **ECF No. 24** PASOUF at ¶ 94; **ECF No. 33** at ¶ 94.  In the table used to consider the preparation of the slate , BCS was not included in the criteria.  Every employee laid off as part of the WRP had a "PA" rating.  **ECF No. 24** PASOUF at ¶ 105; **ECF No. 33** at ¶ 105.  Domínguez was only considered for termination in the total pool of engineers in a similar job classification at PRMO, not worldwide.  **ECF No. 24** PASOUF at ¶ 87; **ECF No. 33** at ¶ 87.  He was the only Product Engineer included in the slate.  **ECF No. 24** PASOUF at ¶ 88; **ECF No. 33** at ¶ 88.  Only two engineers were impacted by the reduction in force, one of which was Domínguez.  **ECF No. 24** PASOUF at ¶ 97; **ECF No. 33** at ¶ 97.

At the time of termination, another engineer, José Baerga ("Baerga"), had a "PA" performance evaluation in 2011, as did Domínguez, and was not terminated.  Baerga was 45 years old and worked as a Mechanical/Hardware Engineer.  **ECF No. 24** PASOUF at ¶ 90; **ECF**

---

[24] Although defendant denies this statement, the explanation only serves to qualify the same. *See* **ECF No. 33** at 16.

[25] Although defendant denies this statement, the explanation only serves to qualify the first sentence of the same. *See* **ECF No. 33** at 18.  The remainder of plaintiffs' statement is unsupported by the record and is an inference drawn by counsel.

**No. 33** at ¶ 90.  Another engineer, Zulinette Rodríguez-Colón, had a "PA" evaluation and was not terminated.  She was a Procurement Engineer and was 25 years old.  **ECF No. 24** PASOUF at ¶ 91; **ECF No. 33** at ¶ 91.  Domínguez was 61 years old at the time of termination; his yearly salary was $70,803.81.  Baerga's salary was $80,000.00 and Rodríguz-Colón's salary was $50,000.00.  **ECF No. 24** PASOUF at ¶ 92; **ECF No. 33** at ¶ 92.  Of the 86 engineers not impacted by the reduction in force, 32 were less than 40 years old.  Not all of these engineers were Product Engineers who worked for the Product Engineering Group in the ESSN business segment.  **ECF No. 24** PASOUF at ¶ 98; **ECF No. 33** at ¶ 98.  Forty-two product engineers remained working with HP after the WRP, and all of them were younger than Domínguez.  **ECF No. 24** PASOUF at ¶ 100; **ECF No. 33** at ¶ 100.

## III.    Summary Judgment Standard

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law based on the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits."  *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)(quoting the former Fed.R.Civ.P. 56(c)).[26]  When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences."  *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir. 2004).

However, the non-movant "must point to competent evidence and specific facts to stave off summary judgment" in order to defeat a properly-supported motion for summary judgment.  *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011).  Thus, the court may "afford no evidentiary weight to conclusory allegations,

---

[26]While Rule 56 was amended, effective December 1, 2010, "the substantive standard for summary judgment remain[ed] unchanged."  *Ahern v. Shinseki*, 629 F.3d 49, 54 n.2 (1st Cir. 2010) (citing Fed.R.Civ.P. 56 advisory committee's note).  The primary alteration is the inclusion of a "procedures" section which, in part, incorporates a common procedure for presentation of factual evidence and an anti-ferreting rule, similar to those already in place in this District, into the summary judgment standard.  *Compare* Fed.R.Civ.P. 56(c) & (f).

empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative." *Id.* (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)). In addition, the "absence of evidence on a critical issue weighs against the party—be it either the movant or nonmovant—who would bear the burden of proof on that issue at trial." *Alamo-Rodríquez v. Pfizer Pharma.*, 286 F. Supp. 2d 144, 151 (D.P.R. 2003) (citing *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001)).

"A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Thompson*, 522 F.3d at 175 (quoting *Sánchez v. Alvarado*, 101 F.3d 223, 227 (1st Cir. 1996)) (internal quotation marks omitted). "A fact is material if it has the potential of determining the outcome of the litigation." *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008). To defeat a properly supported motion for summary judgment, evidence offered by the non-movant "must be significantly probative of specific facts." *Pérez*, 247 F.3d at 317 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vázquez v. López-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252.

## IV. Discussion

### A. ADEA

Plaintiffs allege that HP discriminated against Domínguez and unjustly terminated him from his employment at HP due to his age. **ECF No. 1.** Domínguez claims he was 61 years old at the time of termination and he was the oldest Product Engineer in his group. *Id.* In response, HP moves for summary judgment, arguing that plaintiffs failed to establish a cause of action for age discrimination because Domínguez was layed-off pursuant to a Reduction in Force that HP implemented both globally, including Puerto Rico, and the fact that the

product that he had been working on was transferred to Asia.  **ECF No. 16.**  HP argues that plaintiffs' claim should fail inasmuch as Domínguez has not established a *prima facie* case of age discrimination; and, alternatively, that HP has set forth legitimate, non-discriminatory reasons for its employment decision.  *Id.*  Plaintiffs, in turn, counter that HP applied the workforce reduction plan in a discriminatory manner, adversely affecting him and not the other younger product engineers.  **ECF No. 25.**  Upon careful review of the uncontested facts and applicable case law, the Court agrees with defendant.

The ADEA makes it unlawful for an employer to "refuse to hire or to discharge any individual or otherwise discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  Plaintiff bears the burden of establishing "that age was the 'but-for' cause of the employer's adverse action." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177 (2009); *see also Acevedo-Parrilla v. Novartis Ex-Lax, Inc.*, 696 F.3d 128, 138 (1st Cir. 2012).  Thus, in order to prevail in an ADEA claim, the plaintiffs' age must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2000) (insertion in original); *Hoffman v. Applicators Sales & Serv., Inc.*, 439 F.3d 9, 17 (1st Cir. 2006).  Plaintiff "shoulders the burden of proving that his age was the determinative factor in his discharge." *Bonefont-Igaravidez v. International Shipping Corp.*, 659 F.3d 120, 123 (1st Cir. 2011)

Here, there is no direct evidence of age discrimination.  *See e.g.*, *Vesprini v. Shaw Contract Flooring Servs., Inc.*, 315 F.3d 37, 41 (1st Cir. 2002) ("Although . . . somewhat murky, the term 'direct evidence' normally contemplates only those 'statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision.'" (emphasis omitted)).  When no direct evidence of discrimination exists, the plaintiff may prove his case through the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Bennett v. Saint-Gobain Corp.*, 507 F.3d 23, 30 (1st Cir. 2007).  Therefore, the *McDonnell Douglas* burden-shifting framework applies here.

### (i)    *Prime Facie*

Under *McDonnell Douglas*, plaintiffs bear the burden of establishing a *prima facie* case of age discrimination. In a reduction in force context, "the first step of this framework requires the employee to make out a prima facie case of discrimination by showing that (1) he or she was at least forty years old at the time of discharge; (2) he or she was qualified for his or her position; (3) he or she was fired; and (4) his or her employer either did not treat age neutrally or retained younger employees in the same position." *Cruz v. Bristol-Myers Squibb Co., P.R., Inc.*, 699 F.3d 563, 571 (1st Cir. 2012); *American Airlines v. Cardoza-Rodríguez*, 133 F.3d 111 (1st Cir. 1998).

Once plaintiff establishes a *prima facie* case, the burden of production shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employee's termination. *Id.* The defendant's burden at this stage is only a burden of production; the burden of proof always remains with the plaintiff. *Domínguez-Cruz v. Suttle Caribe, Inc.*, 202 F.3d 424, 430 (1st Cir. 2000) ("The defendant's burden at this stage is only a burden of production; the burden of proof remains with the plaintiff at all times."). If the defendant meets its burden, "the plaintiff no longer can rest on the initial inference of discrimination but, rather, must show that the defendant's articulated reason is pretextual." *Bennett*, 507 F.3d at 31 (citing *Dávila*, 498 F.3d at 16).[27] Thus, at this stage, plaintiff "'must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext for discrimination.'" *Vélez v. Thermo King of Puerto Rico, Inc.*, 585 F.3d 441, 448 (1st Cir. 2009) (quoting *Reeves*, 530 U.S. at 143). Plaintiff's ultimate burden is to prove "that age was the 'but for' cause" of the adverse

---

[27]"'At summary judgment, this question reduces to whether or not the plaintiff has adduced minimally sufficient evidence to permit a reasonable factfinder to conclude that he was fired because of his age.'" *Id.* (quoting *Dávila*, 498 F.3d at 16); *see also Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008).

employment action.  *Id.* (quoting *Gross*, 557 U.S. at 177); *see also Torrech-Hernández v. Gen. Elec. Co.*, 519 F.3d 41, 47 (1st Cir. 2008).

Here, although defendant does not admit the same (**ECF No.16** at 12), it is undisputed that Domínguez has made a *prima facie* showing of age discrimination.  Domínguez was 61 years old at the time of termination; he was qualified for the position he held as he had been product engineer for HP for over 10 years and had been an engineer for 38 years[28]; he was terminated from his employment at HP; and, although HP did not hire any new product engineers, it did retain younger employees as product engineers.   Therefore, Domínguez complies with the *prima facie* showing of age discrimination.  *See Cruz*, 699 F.3d at 571. Triggering the rebuttable presumption that HP violated the ADEA, the burden shifts to defendant to articulate a legitimate, non-discriminatory reason for including Domínguez in the WRP.  In this burden, defendant succeeds.

### (ii)     HP's Legitimate, Non-Discriminatory Reasons

The uncontested record holds that the Hewlett Packard Company's total net revenues in Fiscal Year 2012 were decreasing and had decreased 5.4%.  For the ESSN products, it equally stands uncontested that, during that fiscal year, the company had a 25% decrease in the sales of BCS products.  In response and in an effort to generate savings, the company implemented global initiatives, including the WRP.  The uncontested record is consistent in stating that the world-wide restructuring plan satisfied the company's need to simplify business processes, accelerate innovation and deliver better results for customers, employees, and stockholders.  Consequently, all of the Hewlett Packard Company's operations, including Puerto Rico, were impacted and were called to implement the WRP.

The uncontested record similarly holds that headquarters requested for HP's

---

[28]Consistent with the summary judgment standard highlighted above, the Court views the "qualified" prong in the light most favorable to plaintiff; yet, recognizes that Domínguez's last two evaluations were marginal in this regard.

management to identify lower performers to be included in the WRP.  In compliance, HP prepared a slate containing HP's lower performers.  Each employee in the slate and those chosen for the WRP, Domínguez included, had a PA performance rating.  The slate contains both employees who are within the ADEA protected age and those who are not protected, suggesting an age-neutral, performance-based assessment.  Moreover, the record contains more than ample evidence to sustain HP's assertion that Domínguez was not performing to HP's standards. Domínguez admitted that he had encountered problems with completing mandatory certifications and had received admonishments for such failures, as recently as April of 2012.  The record similarly holds that Domínguez did not attend quality meetings, requiring his supervisor to step in and make him attend; and, that his supervisors would have to follow-up with him, making it difficult to rely on him to take on or complete tasks.  By like token, Domínguez himself admitted that other Product Engineers did not have the same amount of problems in the production line as he did.

In addition, in his most recent performance evaluations for 2010 and 2011, Domínguez had received a P- and PA rating, respectively, both of which point to consistent failures in meeting HP's expectations.  Domínguez agreed with both evaluations.  These evaluations stressed the fact that Domínguez: had experienced problems with delays that required action from management; had to have his supervisor follow-up with him to keep up with requests; had difficulty managing due dates.  All the factors listed above make the decision to include him in the slate as one that is based on the employer's perception regarding his performance. *See García v. Bristol-Myers Squibb Co.*, 535 F.3d at 34 (affirming summary judgment while noting the record "more than adequately demonstrates [plaintiff's] poor work performance and the deterioration of her performance over the course of her PIP, which she essentially does not dispute. Similarly, the record does not provide any support for the proposition that the evaluation process itself was tainted by . . . bias").  Domínguez's evaluations cover the performance issues his supervisor's highlighted either to him, during meetings with him, or through admonishments.

Last, in its WRP letter, HP stated that Domínguez was laid-off as part of an ongoing process to re-align the business and improve its competitiveness.  Identifying the low performers for the WRP is entirely consistent with the company restructuring plan and the WRP's purpose and objective, as decribied in the letter.  Although Domínguez may not be satisfied with the business decision, he conceded that HP wanted to realign and restructure its operations and that its restructuring and the WRP was aimed to streamline its operations. His disagreement with the manner the WRP was implemented or the reasons HP chose him as part of the same does not create an ADEA discrimination claim.  *See González v. El Día, Inc.*, 304 F.3d 63, 69 (1st Cir. 2002) (stating "no matter how mistaken the firm's managers, [the ADEA] does not interfere") (internal citations omitted); *see also Mulero-Rodríguez v. Ponte, Inc.*, 98 F.3d 670, 674 (1st Cir. 1996)(issue is not whether the reasons proffered were real but whether the employer believed them to be so.)

Thus, HP has met its burden of providing a legitimate non-discriminatory reason for including Domínguez in the company's WRP.  *Ruiz v. Posadas de San Juan Associates,* 124 F.3d 243, 248 (1st Cir. 1997)("In order to rebut the presumption that arises upon the establishment of a *prima facie* case— *i.e.,* that the employer engaged in intentional age-based discrimination— the employer need only produce enough competent evidence, *taken as true,* to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action.")(internal citations omitted).  There is no dispute that HP experienced losses and that it was ordered to implement a WRP that required identifying low-performers.

Upon review of HP's reasons and the evidence given to include Domínguez in the WRP, HP has met its burden of production here.  *See Dávila v. Corp. de P.R. Para la Difusión Pública*, 498 F.3d 9, 16 (1st Cir. 2007)(finding sworn statement by director of legal division that employee was terminated due to poor performance as sufficient basis to conclude that the employer articulated a legitimate, non-discriminatory reason for plaintiff's termination). Now, the burden shifts back to plaintiffs to prove pretext.  In this burden, plaintiffs fail.

### (iii)    Pretext

"Under the purview of the ADEA, pretext can be established by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions' in the employer's offered reasons for the termination that a 'reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Bonefont-Igaravidez v. International Shipping Corp.* 659 F.3d at 124 (quoting *Gómez–González v. Rural Opportunities, Inc.,* 626 F.3d 654, 662–63 (1st Cir. 2010)).

To prove pretext, plaintiffs argue a myriad of scenarios: to wit, (1) that Domínguez's duties were not eliminated, but transferred to other younger engineers; (2) that his performance evaluations and HP's issues regarding his performance were a sham because HP invited him to partake in a redeployment program, in which he could apply for another position at HP; and (3) that HP offered "shifting" reasons for terminating Domínguez. **ECF No. 25** at 8-22. Notwithstanding and even viewing all of plaintiffs' scenarios, the Court finds that "but for" age-discrimination pretext is still wanting here.

Regarding plaintiffs' assessment that younger engineers were given Domínguez's responsibilities, the evidence shows that Cuello assumed the remaining responsibilities regarding the BCS transfers.[29]  Cuello was 52 years old, also in the protected age group, and had more seniority than Domínguez within HP.  The evidence also establishes that Cuello's latest evaluation of Exceeded Expectations was superior to Domínguez's Partially Achieves Expectations.  Regardless, the First Circuit has long held that "[w]hen the functions of a furloughed employee are absorbed into the responsibilities of existing employees, who perform these duties along with their own, no legally cognizable 'replacement' occurs." *Cruz-*

---

[29]Plaintiffs' opposition seems to embark on argument regarding a global sum of 88 engineers retained at HP as a premise for age discrimination. **ECF No. 25** at 11.  However, this data is not part of the uncontested facts or the record in this case and is improvidently argued here.  The uncontested record shows that, in the Product Engineering Group where Domínguez worked, he was the lowest performer, with a PA performance evaluation and that all those slated for the WRP were employees with a PA performance rating.

*Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d 381, 384 (1st Cir. 2000)

The uncontested facts demonstrate, by like measure, that all of the Product Engineers in this group were in the protected age group: Lasalde (53); Cuello (52); Cortés (47); Cordero (41); Angarita (40); and, Acevedo (41). ADEA does not create an obligation to maintain the oldest employee simply because he is the oldest within the protected age group. *Cruz-Ramos, 202* F.3d at 385; *see Pages-Cahue v. Iberia Aereas de España*, 82 F.3d 533, 538-39 (1st Cir. 1996)(under ADEA, employers have no obligation to dismiss a younger worker to create a job opening for the older plaintiff). Consequently, the fact that Domínguez was the oldest Product Engineer alone is insufficient to prove that HP's performance related reason for including Domínguez in the WRP was pretext. *Shorette v. Rite Aide of Maine, Inc.*, 155 F.3d 8, 16 (1st Cir. 1998)(plaintiff's testimony that he was the only store manager who was 60 years or older and was demoted did not establish pretext in employer's legitimate, work-related reason for demoting him, to wit: his failure to achieve computer proficiency).

Next, plaintiffs turn to pretext in the performance evaluations and the performance issues Domínguez encountered while at HP. Within Domínguez's performance issues, plaintiffs also submit that all his prior disciplinary warnings, including a 2007 admonishment and a female colleague's complaint of feeling uncomfortable when he went to her home to deliver acerolas, were a sham to build upon a legitimate reason for termination. **ECF No. 25** at 16-22. Yet, the record holds no evidence that these past incidents or admonishments factored into HP's reasons in placing him on the WRP slate. The same served as backdrop regarding Domínguez's tenure in HP; it served to elucidate the employer's framework when evaluating the employee as a whole. Yet, the reasons HP stated for Domínguez's termination remain the same: the PA 2011 performance evaluation and the fact that the BCS product Domínguez worked on was being transferred to Asia. However, even if the Court were to construe these past incidents as evidence of age discrimination, as Domínguez seems to argue, he never complained of age discrimination when he received those admonishments or at any time during his tenure at HP. As such, the Court finds that these earlier warnings and

admonishments do not constitute evidence of age discrimination or pretext here.[30]

As to his more recent performance issues, the ones HP considered in his 2011 performance evaluation, Domínguez himself admitted to: having problems regarding delays; keeping up with his manager's and his client's requests; having his manager follow up with him on the requests because he did not complete them; having problems with due dates; failing to attend quality meetings; and, missing certifications. He did not object or otherwise protest the assessments his manager made regarding his performance or regarding these issues. To the contrary, he agreed with his manager's assessment. Although Domínguez clouts at age discrimination by stating that he had indeed met HP's expectations, he cannot escape the admonishments, warnings and comments his manager's made in his evaluations. Thus, despite plaintiffs' attempt to deflect Domínguez's performance as mere pretext, these issues are consistent with HP's reasons for including him in the slate: he was a lower performer whose performance issues were not improving and whose main product was transferred to Asia. As such, Domínguez is unable to prove pretext with the warnings and the negative evaluations he received.

Furthermore, plaintiffs contend that pretext is found with HP's conflicting stories regarding its reason for including Domínguez in the WRP. They posit that Trabal stated the reason was performance-related, but also testified that the reason was due to the BCS product's transfer to Asia, despite Domínguez's work with other non-transferred products, and that the WRP letter did not state as much. After careful perscrutation of the record, the Court finds no such conflict.

Trabal's deposition testimony was consistent when he stated the main reason for

---

[30]In fact, contrary to plaintiffs' pretext argument, the Court finds that the prior warnings and performance evaluations dispel a finding of pretext altogether. The fact that three different managers identified the same recurring performance theme denotes that the problems Domínguez encountered were not a sham, but an actual issue that Domínguez faced during that later part of his tenure at HP. Domínguez did not improve upon these issues and his 2010 and 2011 performance evaluations so reflected.

termination was performance-related.  HP management reviewed the lower performers and placed them on the WRP slate.  However, the record reflects that Domínguez was not only a lower performer, but the BCS products he worked on were transferred to Asia.  HP made clear that these reasons compelled them to choose Domínguez as part of the WRP.  The record is devoid of contradiction.  Despite plaintiffs' attacks that the BCS transfer was not in the WRP criteria or that the termination letter does not explicitly identify performance or BCS product transfer, the letter does, in broad strokes, cover these areas when it states that the termination was based on the company's restructuring, which took into account Domínguez's skills, knowledge, ability, experience and criticality of employment.  Regardless, even if these alleged inconsistencies exist, the same are insufficient to establish pretext "absent some cognizable nexus to [the defendant's] offered basis for termination."  *Bonefont-Igaravidez*, 659 F.3d at 124-25.  Plaintiffs have not raised any genuine issue as to whether HP believed the truth of its stated reasons for Domínguez' termination.  *Adamson v. Walgreens Co.*, 750 F.3d 73, 81 (1st Cir. 2014).

Plaintiffs also state that Domínguez was working on other products, outside the BCS product line, to prove pretext.  Yet, plaintiffs' own admissions thwart pretext.  Admittedly, Domínguez spent most of his time with the BCS products, reason for which he was the engineer chosen to lead the BCS transfer efforts to Asia.  The fact that he had worked to a lesser degree with products that were not transferred to Asia does not prove that HP's reasons were pretextual.  That HP could have chosen other employees to be included in the WRP or could have measured other criteria does not create a triable issue of fact when there is not conflict or contradiction that points to age discrimination. Specifically, that Domínguez could have been put to work on other products, not transferred to Asia, that he had had some exposure to does not meet plaintiffs' burden of establishing pretext.  Even these assertions were true, this does not overcome the problems with Domínguez's performance or the fact that, due to his PA rating, HP identified Domínguez as one of the low performers for the slate.  Neither plaintiffs, nor the Court, are allowed or called upon to meddle with the employer's

business decisions so long as they are not discriminatory.  As the First Circuit has long held: "When assessing a claim of pretext in an employment discrimination case, the court must focus on the motivations and perceptions of the employer's decisionmaker.  Whether these perceptions are accurate or not, and the motivations apt or inept, so long as they are not discriminatory it is beyond the province of the court to act as a 'super personnel department[],' second-guessing the process by which the decisionmaker has arrived at her conclusion and, in effect, substituting its own business judgment for that of the employer." *Bonefont-Igaravidez v. International Shipping Corp.*, 659 F.3d at 126 (quoting *Mesnick v. General Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991); *see also Arroyo-Audifred v. Verizon Wireless, Inc.*, 527 F.3d 215, 221 (1st Cir. 2008) (courts in employment discrimination cases may not substitute "judicial judgments for the business judgments of employers.").

Plaintiffs are unable to build their case on what HP should have or could have done or by nitpicking how HP reached the decision to include Domínguez in the WRP (**ECF No. 25** at16-19); rather it must present triable issues of fact for a jury to be able to conclude that what HP did and the decision it took was due to age discrimination.  *Meléndez v. Autogermana*, 622 F.3d 46, 53 (1st Cir. 2010)(explaining that even if a trier of fact could infer employer's decision or evaluation of sales records and performance as unfair, it is still insufficient to conclude that the evaluation was a pretext to mask discriminatory animus).  The Court cannot sustain a finding of pretext with plaintiffs' conjecture and speculation regarding defendant's real reasons.  *Bennett v. Saint Gobain*, 507 F.3d at 31 ("But conjecture cannot take the place of proof in the summary judgment calculus.").  Therefore, to meet their burden, plaintiffs must rely on concrete facts and must point to specific evidence that affords the trier of fact with a discriminatory inference and signals of pretext.  Plaintiffs have not done so here.  *See Macone v. Town of Wakefield*, 277 F.3d 1, 5 (1st Cir. 2002) (stating that plaintiffs "are entitled to all inferences which are fairly supported by the evidence, but are not permitted to build their case on mere opprobrious epithets of malice or the gossamer threads of whimsy, speculation and conjecture"); *see also Hoeppner v. Crotched Mountain Rehab. Ctr., Inc.*, 31 F.3d 9, 14 (1st Cir. 1994)

("Even in discriminatory discharge cases, where the plaintiff can rarely present direct, subjective evidence of an employer's actual motive, the plaintiff cannot survive summary judgment with 'unsupported allegations and speculations', but rather must 'point to specific facts detailed in affidavits and depositions—that is, names, dates, incidents, and supporting testimony—giving rise to an inference of discriminatory animus.'" (quoting *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 895 (1st Cir. 1988)); *Medina-Muñoz v. R. J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (explaining that in discrimination cases, summary judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations, improbable inferences, and unsupported speculation" on any essential element of the discrimination claim).

Thus, calling into question his past evaluations and warnings, as well as HP's reasons to include Domínguez in the WRP is simply not enough; such conflict or contradiction must be tied to age discrimination.  Plaintiffs must "eludicate specific facts to support a proposition that [defendant's reason for termination is not only a sham but a sham intended to cover up [its] real . . . motive of discrimination." *Bonefont*, 659 F.3d at 125.  Yet, Domínguez has not provided minimally sufficient evidence from which to conclude, or create a triable issue of fact, that HP's WRP was pretextual and that it somehow masked age discrimination.  *See Pearson v. Mass. Bay Transp. Auth.*, 723 F.3d 36, 40–41 (1st Cir. 2013) ("To defeat summary judgment, [the plaintiff] must offer some *minimally sufficient* evidence, direct or indirect, both of pretext and of [the employer's] discriminatory animus." (internal quotation marks omitted)).

Outside of plaintiffs' speculation and conjecture, the record holds nothing from which to draw that HP's proffered reasons for including Domínguez in the slate were not the real reasons or that age played a role in his termination.  Thus, despite plaintiffs' multiple challenges, they are unable to prove or call into question that HP's reasons for terminating Domínguez were a sham to cover up age discrimination. *Rosado v. Wackenhut Puerto Rico, Inc.*, 160 Fed.App'x. 5, 9 (1st Cir. 2005)("The ADEA does not stop a company from discharging an

employee for any reason (fair or unfair) or for no reason, so long as the decision to fire does not stem from the person's age.  [Plaintiff] must produce evidence beyond the mere assertion that the alleged justification is implausible and show that the employer's discriminatory animus actually motivated the adverse employment action.")(internal citations and quotations omitted); *Mesnick v. General Elec. Co.*, 950 F.2d at 824 ("it is not enough for a plaintiff merely to impugn the veracity of the employer's justification; he must elucidate specific facts which would enable a jury to find that the real reason. . .[was] age discrimination.")

     Furthermore, plaintiffs' reliance on *Vélez v. Thermo King de Puerto Rico, Inc.*, 585 F.3d 411 (1st Cir. 2009) is misplaced here.  Plaintiffs bank their pretext argument on drawing analogies to the employer's shifting reasons which supported the First Circuit's finding of an inference of age discrimination in *Vélez*.  Yet, upon careful review, plaintiffs' analogies miss the mark. HP has not altered its reasons; it has not shifted paths or created incongruence.  In *Vélez*, the employer did not offer Vélez with any reason for terminating him from employment and, one month later, stated to the anti-discrimination unit investigating the case that he had been fired for violating company policy for receiving gifts from suppliers.  Yet, a year later, in response to the complaint, it stated that he was terminated for stealing and selling company property. These reasons did indeed vary and are inconsistent at best.  Furthermore, the *Vélez* plaintiff pointed to evidence suggesting the other younger employees took company property and were not terminated.  Therefore, the First Circuit held that the explanation for firing the employee and not others "so lack rationality that it supports the inference that the real reason . . . was his age.").  *Id.* at 452.  Plaintiffs have not provided any such evidence of disparate treatment or shifting of paths in HP's decisions regarding the WRP.

     In summary, the facts in this case sway against age discrimination.  As stated above, the majority of HP's product engineers in Domínguez's group were within the protected age; the person who absorbed Domínguez's work, Cuello, had more seniority in the company; had a better performance rating than Domínguez; and, was 51 years old.  Performance and the BCS product transfer are age neutral reasons for including Domínguez in the WRP.  The Court

has combed the record, the statements of fact, the admissible evidence in support of the same, and find that defendant's stated reasons for its employment action stand. Plaintiffs have not met their burden of proving that age discrimination played a "but for" role in HP's decision to terminate Domínguez. In this light, plaintiffs have not presented any evidence to show that age discrimination was the "but for" cause in HP's decision to terminate Domínguez as part of the WRP. As a result, plaintiffs have failed to meet their burden as to pretext; therefore, their ADEA claim fails.

### B.    Supplemental Jurisdiction

Since the federal claims have been dismissed, and no other grounds for jurisdiction exist, the court declines to exercise supplemental jurisdiction over plaintiffs' remaining state law claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988) (explaining that the exercise of pendent jurisdiction is a matter of the federal court's discretion and not one of plaintiff's rights); *United Mine United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966) (stating "if the federal claims are dismissed before trial, . . . the state law claims should be dismissed as well."). Accordingly, plaintiffs' claims brought pursuant to Commonwealth law are **DISMISSED WITHOUT PREJUDICE**.

### IV.    Conclusion

Based upon the foregoing, defendant's motion for summary judgment (**ECF No. 16**) is **GRANTED IN PART**. Plaintiffs' federal claims are hereby **DISMISSED WITH PREJUDICE**. Plaintiffs' Commonwealth of Puerto Rico law claims are **DISMISSED WITHOUT PREJUDICE**. Clerk is to enter judgment accordingly.

**SO ORDERED.**

At San Juan, Puerto Rico, on this 31st day of March, 2015.

**S/AIDA M. DELGADO-COLON**
**Chief United States District Judge**